UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Yamasaki Korea Architects, Inc.,
a foreign corporation,

      Plaintiff/Counter-Defendant,

v.                              Case No. 08-10342

Yamasaki Associates, Inc., a Michigan         Honorable Sean F. Cox
corporation, *et al.*,

      Defendants/Counter-Plaintiffs.
_____/

## OPINION & ORDER

      This case involves disputes between the parties relating to architectural services on three

different projects, and a claim for breach of a licensing agreement.  Because the parties had a

contract that required them to arbitrate all claims relating to one of those three projects, this

Court previously issued an order compelling the parties to arbitrate all claims relating to that

project.  The claims relating to the other two projects, and the breach of licensing agreement

claim, remain in this action.

      The matter is currently before the Court on two motions: 1) a Motion for Partial

Summary Judgment brought by Plaintiff/Counter-Defendant Yamasaki Korea Architects, Inc.;

and 2) a Motion for Summary Judgment brought by Defendants/Counter-Plaintiffs Robert

Szantner and Yamasaki Associates, Inc.  The parties have fully briefed the motions and oral

argument was heard on June 25, 2009.  As explained below, the Court shall GRANT THE

MOTIONS IN PART AND DENY THE MOTIONS IN PART.  The Court shall GRANT the

motions to the extent that the Court shall:  1) grant summary judgment in favor of

Plaintiff/Counter-Defendant on Defendants/Counter-Plaintiff's "Breach of Licensing

Agreement" claim; and  2) dismiss Counts II, III, IV, VIII and IX of Plaintiff/Counter

Defendant's complaint as to Defendants Szantner and Ayoub only.  The Court shall DENY all

remaining grounds for relief in the two motions because, based upon the conflicting testimony

given by the parties, genuine issues of material fact preclude summary judgment.

BACKGROUND

A.    Procedural Background:

        On January 23, 2008, Plaintiff Yamasaki Korea Architects, Inc. ("Korea") filed this

action against the following Defendants: 1) Yamasaki Associates, Inc. ("Associates"); 2)

Yamasaki International, Inc. ("International"); 3) Ted Ayoub ("Ayoub"); and 4) Robert Szantner

("Szantner").  Korea's complaint, which includes a jury demand, asserts the following claims:

"Count I – Breach of Contract – Qatar Convention Project;" "Count II - Breach of Contract –

IBQ Project;" "Count III – Breach of Contract – Lusail Project;" "Count IV – Account Stated;"

"Count V – Fraud Based on Bad-Faith Promises;" "Count VI – Silent Fraud," "Count VII –

Negligent Misrepresentation," "Count VIII – Unjust Enrichment," "Count IX – Promissory

Estoppel," "Count X – Alter Ego Liability;" and "Count XI - Injunctive Relief."

        On February 28, 2008, Defendants/Counter-Plaintiffs asserted the following

counterclaims against Korea:  "Breach of Contract" (Count I); "Breach of License Agreement

and Declaratory Relief" (Count II); "Unjust Enrichment" (Count III); and "Implied Contract /

Promissory Estoppel" (Count IV).

        In an Opinion & Order dated November 17, 2008, this Court compelled the parties to

2

arbitrate all claims relating to the Qatar Convention Project because it is undisputed that the written contract governing that project has an arbitration provision requiring the parties to arbitrate all claims relating to that project and because Defendants have not waived their right to arbitrate those claims.  (11/17/08 Opinion & Order at 1).  Thus, Count I of Korea's complaint is no longer in this action.  In addition, those portions of the parties' remaining claims, to the extent that they are based on the Qatar Convention Project, are also subject to arbitration and are therefore no longer in this action.  (*See* Order Granting Motion for Clarification).

Following the close of discovery, the parties filed the following motions.

On March 27, 2009, Defendants/Counter-Plaintiffs Associates and Szantner filed a Motion for Summary Judgment.  (D.E. No. 41).  On that same date, a "Joinder of Defendant Ted Ayoub in Motion for Summary Judgment" was filed.  (D. E. No. 42).

On March 27, 2009, Plaintiff/Counter-Defendant Korea filed a Motion for Partial Summary Judgment.  (D.E. No. 43).

B.    Factual Background:

Defendant/Counter-Plaintiff Associates is a world-renowned architectural firm.  Defendant/Counter-Plaintiff Ayoub is the current CEO of Associates.

Plaintiff/Counter-Defendant Korea is a Korean company that was formed by Charles Hong and his son, Tae Hong, in 2000.  (D.E. No. 43 at 2).

Defendant/Counter-Plaintiff International is a separate company that was formed in either 2006 or 2007 by Ayoub.  International was formed to market the services of Associates on an international basis, particularly in the middle east.  (Ayoub Affidavit at ¶ 2).

Both Charles Hong and Tae Hong had relationships with Associates.  Plaintiff contends

that Charles Hong was a shareholder of Associates.  (D.E. No. 43 at 2).  Defendants, on the other

hand, contend that Charles Hong was not a shareholder, but rather loaned money to Associates

and the company issued stock to him to hold as security for repayment of the loan.  (D.E. No. 44

at 3).  Ayoub contends that in 2007, he agreed to pay that debt on behalf of Associates and, in

return, the stock held by Charles Hong was issued to Ayoub.  (*See* D.E. No. 44 at 3; Ayoub

Affidavit).

It is undisputed that Tae Hong, an architect, became a full-time employee of Associates

in 1993.  In 2007, the annual salary that Associates was paying Tae Hong was $150,000.  (D.E.

No. 43 at Ex. D at ¶ 13; Ayoub Affidavit at ¶ 3).  Tae Hong states that he was terminated as an

employee of Associates in December 2007.  (Tae Hong Affidavit at ¶ 5).

1.    The IBQ Project:

It is undisputed that in 2007, one of the projects that Associates was working on was the

headquarters for the International Bank of Qatar ("IBQ Project").  The parties have divergent

positions, however, as to how Tae Hong and/or Korea became involved in the IBQ Project.

Korea contends that during the year 2007, it "worked on various projects for

[Associates], including" the IBQ Project.  (Tae Hong Affidavit at ¶ 10).  Korea contends that in

June, 2007, concerns about the status of the IBQ were expressed to Ayoub.  Korea states that,

"during a meeting at [Associates's] Troy office, Ted Ayoub asked Tae Hong to help [Associates]

salvage the project."  (D.E. No. 43 at 4).  Tae Hong states that Ayoub was frustrated with Robert

Szantner's performance on the IBQ Project, which almost cost Associates the job.  (Tae Hong's

Dep. at 124-25; Tae Hong's Affidavit at ¶ 12).  Tae Hong testified that he gave Ayoub a "certain

scenario how to salvage" the project, which included using Korea.  (Tae Hong Dep. at 124-27;

4

Tae Hong Affidavit at ¶ 13).  Tae Hong testified that he told Ayoub that he had to use Korea's services in order to finish the project, asked Ayoub whether that was okay, and Ayoub said that was okay.  (Tae Hong Dep. at 126-27; Tae Hong Affidavit at ¶ 14).  Tae Hong further testified as follows:

> Q.     I understand.  And by your own testimony, Mr. Ayoub discussed with you being like a project manager, in charge of IBQ, whatever your words were, for [International], correct?
> A.     For International and Associates. . .

(Tae Hong Dep. at 128).

Tae Hong states that Ayoub specifically requested Korea to invoice International for the services Korea performed on the IBQ Project.  (Tae Hong Affidavit at ¶ 17; Tae Hong Dep. at 122).  Tae Hong states that Korea performed approximately $327,000 worth of architectural services for Associates on the IBQ Project, "266,629.04 of which remains unpaid."  (Tae Hong Affidavit at ¶ 16).

Ayoub and International have a different version of the events.  Ayoub and International contend that when Ayoub received some feedback that the IBQ Project "needed some additional manpower, he directed Tae Hong to work on the project."  (Docket Entry No. 44 at 4; Ayoub Affidavit).  Ayoub contends that, at that time, "Tae Hong was a full time employee of [Associates], expected to devote his full time and attention to those duties, and was being paid a salary of $150,000 per year."  (*Id.*).  Ayoub's Affidavit further states that Tae Hong was not permitted to work for Korea.  He states that Tae Hong was to perform services on the IBQ Project as an employee of Associates "and was not authorized to subcontract out any of that work to his father's company," Korea, "or bill his own time through" Korea.  (*Id.*).  Ayoub's Affidavit further states the following with respect to the IBQ Project:

5.      Some time in August or September of 2007, Mr. Hong presented me with
an invoice for $60,000 from [Korea] for work performed on the IBQ
project.  I admittedly became very upset with Mr. Hong, since I was
paying him $150,000 per year to work for [Associates] and did not
authorize him, or anyone else, to perform the work for [Korea] and then
bill [Associates].  I told Mr. Hong that I would pay this one invoice, but
under no circumstances was he to have any further work on IBQ
performed by or through [Korea].  I authorized payment of the $60,000
invoice and it was paid.

6.      Mr. Hong resigned from [Associates] in November of 2007.  Prior to the
time he resigned, he did not present me with any other invoices on IBQ.
Mr. Hong knew that I expected that all of the work would be performed at
[Associates.]

7.      Some time after Mr. Hong resigned from [Associates], our controller, Lee
Yesh, found under his door copies of the IBQ invoices from [Korea] that
are part of its claims in this law suit.  That work was primarily for work
performed by Mr. Hong as an employee of [Associates], but billed through
[Korea].  If Mr. Hong had any additional work performed at [Korea], that
work was not authorized by [Associates] or [International].

8.      Based on the money already paid to Mr. Hong and his father's company in
Korea, I do not believe that there are any amounts due [Korea] on the IBQ
project.

(Ayoub Affidavit at ¶¶ 5-8).

2.      The Lusail Project:

The parties also have divergent positions as to what they refer to as the "Lusail Project."

It is undisputed that although Associates bid on that work, Associates did not obtain the contract

for the Lusail Project.  (*See* D.E. No. 50, at 5).

Korea contends that in 2007, Korea "provided architectural services to [Associates and/or

International] at their request in connection with the Lusail development project in Qatar" and

that it was told it would be paid for that work.  Tae Hong testified as follows:

Q.      Even if you think that you've got it in the bag because the client really
likes you, Tae Hong, and I know you've got a presentation for being a

6

great presenter and a very bright guy and a Yale guy and a very good
architect, correct? But even if you think that you've got the project
completely in the bag because the client loves you, there's always a
percentage that you're not going to get the job, correct?

A.  That's right.

Q.  And it happens sometimes?

A.  Yes.

Q.  That isn't fraud, is it?

A.  But it's basically the decision of the owners of each architectural
corporation to make a decision whether to perform that competition,
design competition, quote-unquote, RFP process because that costs
money.  Sometimes close to, you know, $300,000 in some cases and some
cases $50,000, because one rendering alone costs you $500 to a thousand
dollars so we have to make a decision whether this is a possibility, who's
going to pay for it, and obviously [Associates] didn't have enough
staffing, *but Tey Ayoub was assured of himself he was going to get this
project, he's going to invest some money and go get the project.  He asked
[Korea] to perform services and I obviously told then told Tey Ayoub, you
know, [Korea] cannot do this work free, some price has to be paid, plus
all the other consulting fees including rendering services.*  You can see the
invoice includes the renderings that we've done for [Korea].

Q.  Did Ayoub make a false statement that you relief on?

A.  Well, *Ayoub personally told me that [Associates or International] will pay
for the work so just finish the presentation by such, such time* and you
have to come back and present the work to Mr. Essam, that which I did.

Q.  And [International] did make a payment?

A.  Nothing on Lusail.

Q.  No, on IBQ?

A.  IBQ is a different story.  I was talking about Lusail.  IBQ had a contract,
but Lusail didn't, so at the time of making a decision to proceed with the
design competition, we had to make a decision on it and *Ted Ayoub
assured that we were going to get this project and he's going to pay for
[Korea's] work.*

(Tae Hong Dep. at 159-61) (emphasis added).  Korea contends that it is owed $130,243.53 for

the work it performed on the Lusail Project.  Tae Hong's Affidavit states that Ayoub told him to

have Korea invoice International for the work that Korea performed on this project.  (Tae Hong

Affidavit at ¶ 24).

Ayoub and International contend that the Lusail Project, the other "project" at issue in

this case, is really not a "project" at all.  Rather, it was a potential project that Associates bid on,

along with many other bidders.  Ayoub's affidavit states the following regarding the Lusail

Project:

> 9.      The other matter mentioned in Mr. Hong's law suit is what he calls the "Lusail" project.  This matter involved an attempt to obtain another project for [Associates].

> 10.     As Mr. Hong knows, our company was bidding along with other companies for the Lusail project.  Mr. Hong knew that we may or may not get the project.  If we were awarded the project, then of course we would be paid for services performed on the project.

> 11.     Mr. Hong also knew that, like all proposals in our business, if we were not the successful bidder on the Lusail project, then no one would be paid for attempts to obtain that work.  The Lusail project was awarded to a company known as Ehaf, and neither [Associates nor International] ever received any payment of any kind on the Lusail project.  We knew that if we were not the successful bidder that we would not receive any payment, as did Mr. Hong.

> 12.     Based on the above, neither [Associates nor International] owed [Korea] any sums for work performed on the proposal for the Lusail project.

(Ayoub Affidavit at ¶¶ 9-12).

## ANALYSIS

A.    <u>Motion For Summary Judgment Filed By Associates And Szantner:</u>

Associates and Szantner note that the remaining claims in this action are based solely

upon the IBQ Project and the Lusail Project.  Associates and Szantner filed a Motion for

Summary Judgment that seeks dismissal of claims asserted against Associates and Szantner

based upon certain portions of Tae Hong's testimony:

> This Motion is brought on behalf of Defendants [Associates and Szantner] for the reason that Plaintiff's chief witness, Tae S. Hong, repeatedly testified at his deposition that [Szantner and Associates] were not involved with [Korea][ on the IBQ and Lusail projects.  As such, by Plaintiff's own admission, claims against

8

these moving parties must be dismissed.

(D.E. 41 at 4).

In response, Korea states that:

In Count II and III of its Complaint, [Korea] claims that [Associates and International] are indebted to it for work performed on two architectural projects. In Counts IV, VIII and IX, [Korea] asserts alternative theories of statutory and equitable liability against [Associates and International] based upon the agreements between the parties. Because there are genuine issues of material fact as to these claims, summary judgment should be denied.

(D.E. No. 49 at 1). At the June 25, 2009 hearing, Korea's counsel confirmed that it wishes to assert Counts II, III, IV, VIII and IX only against Associates and International. Thus, to the extent that Korea's complaint asserts those counts against Szantner and Ayoub, Korea agrees that those claims should be dismissed as to Szantner and Ayoub.

The Court shall deny the remainder of the motion for lack of merit. The motion seeks summary judgment based on Tae Hong's deposition testimony. Associates has submitted discrete portions of Tae Hong's deposition testimony that, when read in isolation, appear to indicate that he is stating that Korea's claims as to the IBQ and Lusail Projects are against International, not Associates. When those statements are read in context with other portions of his deposition testimony, however, it is apparent that Tae Hong testified that Associates and/or International are liable for the payments to Korea.

Ayoub is an officer of both Associates and International. Tae Hong testified that Ayoub asked Tae Hong to help Associates salvage the project. He states that Ayoub was frustrated with Robert Szantner's performance on the IBQ Project, which almost cost Associates the job. (Tae Hong's Dep. at 124-25; Tae Hong's Affidavit at ¶ 12). He further testified that he gave Ayoub a "certain scenario how to salvage" the project, which included using Korea. (Tae Hong Dep. at

9

124-27; Tae Hong Affidavit at ¶ 13).  Tae Hong testified that he told Ayoub that he had to use

Korea's services in order to finish the project, asked Ayoub whether that was okay, and Ayoub

said that was okay.  (Tae Hong Dep. at 126-27; Tae Hong Affidavit at ¶ 14).  Tae Hong further

testified as follows:

> Q.   I understand.  And by your own testimony, Mr. Ayoub discussed with you
> being like a project manager, in charge of IBQ, whatever your words
> were, for [International], correct?
> A.   *For International and Associates. . .*

(Tae Hong Dep. at 128) (emphasis added).  Finally Tae Hong testified that Ayoub specifically

requested Korea to invoice International for the services it performed on the IBQ Project.  (Tae

Hong Affidavit at ¶ 17; Tae Hong Dep. at 122).

**B.**     <u>Motion For Partial Summary Judgment Filed By Korea:</u>

In this motion, Korea asks the Court to grant summary judgment in its favor as to Counts

II, III, IV and VIII of its complaint and dismiss Count II of Yamasaki Associates, Inc.'s

Counterclaim.

**1.**     <u>Is Korea Entitled To Summary Judgment With Respect To Counts II, III, IV and
VIII Of Its Complaint?</u>

In its Motion, Korea asserts that it is entitled to summary judgment with respect to its

claims for payment for the work it performed on the IBQ and Lusail Projects.

**a.**     <u>Korea's Breach Of Contract Claims:</u>

In Counts II and III, Korea asserts breach of contract claims relating to the IBQ Project

(Count II) and the Lusail Project (Count III) against Associates and International.  In its motion,

Korea asserts that the evidence establishes that it had binding oral contracts with Associates and

International entitling it to payment for the work it performed on the IBQ and Lusail Projects and

10

that Associates and International breached those oral contracts.

Based on the testimony of Ayoub, however, it is apparent that genuine issues of fact exist that preclude entry of summary judgment as to Counts II and III.

In its Reply Brief, Korea asserts that Ayoub's Affidavit "contradicts his own statements." Korea has not established, however, that Ayoub's Affidavit contradicts any deposition testimony he has given in this case. Rather, Korea attempts to discredit Ayoub's Affidavit in two manners.

First, Korea attempts to discredit his Affidavit by pointing to rather ambiguous statements by Ayoub. For example, with respect to the IBQ Project, Korea notes that in one e-mail Ayoub noted that he had received an invoice for "YK IBQ services," and said that in "an effort to reconcile and close-out billing please ask Sang for the detailed back up including hour by individual." (Ex. N to D.E. No. 43). That document does not necessarily contradict Ayoub's version of events. Even Ayoub acknowledges that he agreed to pay, and did pay, one invoice for $60,000 on the IBQ Project. It is not apparent from the e-mail whether Ayoub is discussing that invoice or other invoices received from Korea on the IBQ Project.

With respect to the Lusail Project, Korea contends that Ayoub's "statements are contradicted by the emails sent by Mr. Hong to Mr. Ayoub" and specifically refers to an August 31, 2007 e-mail from Tae Hong to Ayoub. Korea asserts that "there is nothing in Mr. Ayoub's affidavit that explains why he received a 'budget' for the services [Korea] was performing if [Korea] would not be paid." Notably, this e-mail, attached as Exhibit P was sent by Tae Hong – not Ayoub. Thus, the Court fails to see how Korea believes that e-mail can be seen as Ayoub contradicting Ayoub's Affidavit because Ayoub did not author it. Moreover, the e-mail by Tae Hong to Ayoub indicated that it was attaching a spreadsheet "calculating the *potential* budget"

11

for the Lusail Project.  (emphasis added).

Second, Korea attempts to discredit Ayoub's Affidavit by asserting that Ayoub's version of events should be rejected because he has not produced documents that support his version of events.  (D.E. No. 46 at 3)(Ayoub's Affidavit "sheds no light on why he has failed to produce one piece of paper substantiating his claims.").  However, the parties are not required to present documentary evidence to support deposition testimony and/or affidavits.

Accordingly, the Court concludes that when the evidence presented is viewed in the light most favorable to the non-moving parties, it is clear that there are genuine issues of material fact that preclude summary judgment on Counts II and III.

        b.      <u>Korea's Account Stated Claim</u>:

Count IV of Korea's complaint asserts an "Account Stated" claim.  In that count, Korea alleges that "[b]etween May 2006, and December 2007, [Korea] and [Associates] did business with each other on credit" and that at "Defendants' request, [Korea] provided services to [Associates] on open account."  (Korea's Compl. at 9).  Korea alleges that it "sent statements of the account to [Associates], which received and retained the statements without objection about any part of the account."  Korea alleges that "Associates is now justly indebted to [Korea] in the amount of $266,629.04 on the IBQ Project" and "$130,243.53 on the Lusail Project."  (*Id*.).  Korea further alleges that "an affidavit verifying the balance due on the account is attached at exhibit 1, and a copy of the account itself is attached to the affidavit as exhibit 2."  (*Id*. at 10).  The attached "Affidavit of Account" is made by Charles Hong, who states that Associates is indebted to Korea.

In its Motion for Summary Judgment, Korea alleges that "An Account has Become

Stated Between [Korea] and [International] and Thus Summary Judgment is Appropriate as to

Count IV." (Docket Entry No. 43 at 15). Korea's motion states that "in response to [Korea's]

complaint, [International] failed to submit a counter-affidavit of account stated." (*Id.*).

Korea notes that M.C.L. § 600.2145 provides, in pertinent part, that:

> . . . to recover the amount due on an open account or upon an account stated, if
> the plaintiff or someone in his behalf makes an affidavit of the amount due, as
> near as he can estimate the same, over and about all legal counterclaims and
> annexes thereto a copy of said account, and cause a copy of said affidavit and
> account to be served upon the defendant, with a copy of the complaint filed in the
> cause or with the process by which such action is commenced, such affidavit shall
> be deemed prima facie evidence of such indebtedness, unless the defendant with
> his answer, by himself or agent, makes an affidavit and serves a copy thereof on
> the plaintiff or his attorney, denying the same.

Korea then states, "Here, [International] has failed to submit any affidavit denying that it

owes the amounts due. Consequently, summary judgment is appropriate as to Count IV." (D.E.

No. 43 at 15).

In response, International notes that Korea's affidavit of account avers that Associates –

not International – is indebted to Korea. (D.E. No. 44 at 7). International asserts that because

there was no affidavit of account filed against International, there was no affidavit for

International to file a "counter-affidavit" against. International further notes that the party that

was the subject of Korea's affidavit of account, Associates, did file a counter-affidavit denying

the debt.

The Court agrees with International's position and shall deny Korea's request for

summary judgment as to this claim.

c.       Korea's Unjust Enrichment Claim:

Korea also seeks summary judgment on its alternative claim for unjust enrichment.

13

Citing *In re McCallum Estate*, 153 Mich.App. 328, 335 (1986), Korea asserts that under

Michigan law, unjust enrichment "is proper when, in the absence of a valid and binding contract,

it would be unjust or inequitable for one party to retain a solicited benefit."  Korea asserts that

even if the Court finds that Associates is not contractually obligated to Korea, Associates has

been unjustly enriched from the benefit it has received from Korea's work and therefore

summary judgment is appropriate.  Korea contends that Associates received a benefit from the

work it performed on the IBQ Project.  It further asserts that, "as to Lusail, it is undisputed that

[Korea] performed the work and that [Associates] derived a benefit.  Indeed, although

[Associates] did not obtain the contract to design the Lusail development, its ability to compete

for such a prestigious development obviously enhanced its business reputation and visibility on

the international stage."  (D.E. No. 43).

      In response, Associates disputes that it derived a benefit from any work Korea performed

in relation to Lusail, noting that it "is undisputed that no Yamasaki entity was awarded any work

on the Lusail project."  (D.E. No. 8).  Associates also asserts that Korea cannot obtain summary

judgment on its unjust enrichment claim as to the IBQ Project:

> As to IBQ, Plaintiff frankly just doesn't seem to get it.  Tae Hong was a full time
> principal of [Associates].  He was being paid $150,000 per year to work full time
> for [Associates]. He was not free to take that money, and at the same time bill for
> his work through his Korean company, the Plaintiff in this case. [Associates] has
> paid for Mr. Hong's work through his compensation.  He is entitled to nothing
> more.

(*Id.*).

      The Court concludes that, based on the conflicting testimony, Korea is not entitled to

summary judgment with respect to its claim for unjust enrichment.

      2.      <u>Is Korea Entitled To Summary Judgment With Respect To Associates's Counter-</u>

<u>Claim For Breach Of Licensing Agreement?</u>

In Count II of the counter-complaint, Associates asserts a claim for "Breach of License Agreement."

Korea asserts that it is entitled to summary judgment with respect that claim. Its brief states that "[o]n June 26, 2007, as reflected in the meeting minutes for a Special Meeting of the Board of Directors, see Meeting Minutes, Ex. D, Yamasaki Associates, Inc. 'permit[ed] and guarantee[d] [] Charles C. Hong' the '*continued right to use the brand name 'Yamasaki' as contemplated by his existing corporation 'Yamasaki Associates Korea, Inc*.'" (emphasis added)." (D.E. No. 43 at 3).

Attached as Exhibit D is a document titled, "Memorandum of Understanding for Assignment of Promissory Notes, Stock Rights and Other Claims." That document states, in pertinent part, that:

> For valuable consideration to be received, Charles C. Hong, does hereby agree to assign to Architects Worldwide, Inc., for the price described below, 300 shares of Yamasaki Associates, Inc. stock according to the following terms and conditions which must be satisfied prior to closing:
> . . . .
> 7. Architects Worldwide, Inc. as the new owner of Yamasaki Associates, Inc. guarantees indefinitely Charles C. Hong to have the right to use the brand name of "Yamasaki" to operate the existing "Yamasaki Associates Korea, Inc."

(Ex. D to D.E. No. 43 at 1). At the bottom of the document, it states "[t]he undersigned acknowledge that we understand the terms and conditions of this Agreement and voluntarily agree to be bound by them." The document is then signed by: 1) Ted Ayoub, as CEO of Architects Worldwide, Inc.; 2) Tae Sun Hong; 3) Charles C. Hong; and 4) Robert Szantner as President of Yamasaki Associates, Inc.

At the June 25, 2009 hearing, Associates asserted that the above document does not

15

constitute an agreement because it was not supported by consideration.  In response to a question

from the Court, Counsel for Associates then stated that *there was no licensing agreement*

*between the parties.*  When asked further questions regarding the breach of licensing agreement

claim, however, Counsel back-tracked, taking the position that a licensing agreement did exist

between the parties.  Counsel then stated that: 1) the licensing agreement was oral, not written;

2) he did not know when the agreement was made or who made the agreement.  Counsel then

identified the alleged licensing agreement as:  my client demanded that Korea pay a $50,000 per

year licensing fee and Korea did not pay it.  (*See* 6/25/09 Hearing Tr.).

In light of the grounds presented in Korea's Motion for Summary Judgment, and the

statements by Counsel made on the record at the hearing, the Court concludes that Korea is

entitled to summary judgment on the breach of licensing agreement claim.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Plaintiff/Counter-Defendant's

Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART.  The motion

is GRANTED to the extent that the Court rules that Korea is entitled to summary judgment with

respect to the Breach of Licensing Agreement Claim asserted against it.  The motion is DENIED

in all other respects.

IT IS FURTHER ORDERED that Motion for Summary Judgment brought by

Defendants/Counter-Plaintiffs Robert Szantner and Yamasaki Associates, Inc. is GRANTED IN

PART AND DENIED IN PART.  The motion is GRANTED to the extent that Counts II, III, IV,

VIII and IX of Plaintiff/Counter Defendant's complaint are dismissed as to Defendants Szantner

and Ayoub. The motion is DENIED in all other respects.

IT IS SO ORDERED.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  June 30, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record on
June 30, 2009, by electronic and/or ordinary mail.

S/Jennifer Hernandez
Case Manager